SHERMAN P. COMSTOCK ET AL *v.* JOHN E. SHANNON ET AL.

(73 A2d 111)

February Term, 1950

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS and BLACKMER, JJ.

Opinion filed May 2, 1950.

*Waterman & Downs* for the plaintiffs.

*McNamara & Larrow* for the defendants.

CLEARY, J.   This is an action for fraud in the sale of real and personal property and the business of conducting an inn for summer boarders.   Trial was by jury.   The case is here on plaintiff's exception to the granting of defendants' motion for a directed verdict and judgment for the defendants made at the close of the plaintiffs' case.

In passing upon a motion for a directed verdict the evidence must be viewed in the light most favorable to the plaintiffs and the effect of modifying evidence is to be excluded.   *Appleyard Motor Transportation Co.* v. *Ray Co.,* 115 Vt 519, 520, 66 A2d 10.  Viewed in this light the evidence tended to show the following facts: The plaintiffs are a young couple, husband and wife, now living in Underhill, Vermont.   They formerly lived in Stoneham, Massachusetts, where they owned a home, the husband then being employed in Boston by the Lumbermen's Mutual Casualty Company as a junior executive.   The defendants are also husband and wife and are residents of Underhill, Vermont.

In the spring of 1947 the defendants employed Frances Keliher, a real estate agent in Montpelier, Vermont, to sell their real and personal property and inn keeping business known as "Shannon's" or "Shannon's Lodge" in Underhill, which they had then owned and conducted for thirty nine years.   They informed Keliher they were getting along in years and felt it was time to retire.

The plaintiffs contacted Keliher in May, 1947, with the thought in mind of purchasing real estate in Vermont for a summer home. Keliher took them to Underhill to look at the Shannon property. From then on Mrs. Shannon, with her husband's approval, did most of the talking and transacted all of the business with the plaintiffs. Neither of the plaintiffs had ever had any experience in the inn keeping business.   Mrs. Shannon represented to them that she

was worn out, was tired of taking boarders, would like to retire from further activity in that line, that when she retired she was going to move to the Wheeler farm, which she owned and which was about two hundred yards distant from "Shannon's" and that she was selling with that thought in mind. She represented to them that "Shannon's Lodge" was booked completely full for the summer of 1947, that many people had been turned away, that in the event of any cancellations such vacancies could be very easily filled, that to turn so many people away might be harmful for the business unless she took the overflow to sleep at the Wheeler farm, that, as a favor to the plaintiffs, she was willing to do so but that the guests sleeping at the Wheeler farm would all take their meals at "Shannon's Lodge," thus tieing them into that place so that they would feel they were staying at "Shannon's Lodge" and that, when making reservations at some future date, the plaintiffs would have the advantage of their trade. She represented to the plaintiffs that she had bought the Wheeler farm to protect herself from competition in her business and would give them an option to buy it so that, if at any time she wished to sell the Wheeler farm, the plaintiffs could protect themselves from competition as she had done. She represented to the plaintiffs that she and her husband were completely finished with the summer boarder business, that they were immediately retiring to their adjoining farm, that they would not compete with the plaintiffs' business but would help them in every way possible. She represented to the plaintiffs that they were buying the place furnished as it was except that she would like to have her piano and take her personal effects, that the property was insured for three years and paid up, that the June, 1947, business would enable them to buy supplies for the entire year, that she had found it worked out that way, that she had realized 50% profit from her business but that the plaintiffs would realize 65% profit because they would have to hire less help. She agreed to stay with the plaintiffs during June until they got used to the business. She brought the plaintiffs to the Burlington Savings Bank to arrange for a mortgage loan where she repeated her representations that she was worn out, tired of taking boarders, wanted to retire and move to the Wheeler farm, going out of business, would not compete with the plaintiffs, and would do all she could to make the plaintiffs' business a success.

After the plaintiffs had returned to Massachusetts Mrs. Shan-

non learned that the bank had written the plaintiffs it would not make the mortgage loan, called them by telephone and told them she would take the mortgage herself. So the plaintiffs returned to Vermont. The evidence tended to show that, relying on Mrs. Shannon's representations and believing them to be true, the plaintiffs, on June 2, 1947, agreed in writing to buy the land and premises for $21,000, paid $1000 down, agreed to pay $10,000 on or before July 15, 1947, and to give the defendants a mortgage and note for the remaining $10,000. Mrs. Comstock took immediate possession of the property and Mr. Comstock returned to Massachusetts to sell their home there, to resign from his position and to ship their household goods to Vermont. The plaintiffs were delayed in selling their Massachusetts home so on July 15, 1947, they paid the defendants $2000 and made a new contract with them which superseded that of June 2, 1947; the new contract acknowledged receipt of $3000, called for a $6000 payment on or before August 15, 1947, and a mortgage and note for $12,000, payable $600 and annual interest at 5% on or before September 15 of each year. Under this contract the defendants agreed to convey the real estate, the furniture and furnishings then in the house and the right to use the name "Shannon's," or "Shannon's Lodge," or "Shannon" in connection with the business to be conducted on the premises.

During June Mrs. Shannon took Mrs. Comstock over to the Wheeler farm to see her kitchen and while there told her "I have always wanted to have a kitchen that was all equipped electrically when I got around to retire, now I can have it." She took away and moved to the Wheeler farm, all the living room furniture except one chair, took an electric roaster, electric toaster, fryolater, all the linen except one tablecloth and that could not be used, approximately all the silverware, and exchanged all the beds. She made the plaintiffs pay her a bill of $132.76 for coal, chicken feed, phosphate, garden plowing and other items which took their entire June income.

The first guest arrived on June 2, 1947, a Mrs. Montague, who had been coming to the lodge for twelve years. She had been accustomed to pay $35 per week but, on Mrs. Shannon's advice, Mrs. Comstock increased her rate to $40 per week. About the middle of June Mrs. Shannon told Mrs. Comstock that Mrs. Montague was a dear old friend, that, though perfectly satisfied with the treatment

she had received from Mrs. Comstock, Mrs. Montague thought she would be happier with Mrs. Shannon at the Wheeler farm. Mrs. Shannon assured Mrs. Comstock she would be better off because Mrs. Montague was occupying two rooms and by renting them to a family of two adults and a child Mrs. Comstock might have an income of at least $85 per week and that Mrs. Shannon would have no difficulty filling the two rooms for her; she assured Mrs. Comstock she was out of business and was not competing with her. So Mrs. Comstock agreed. Mrs. Shannon moved to the Wheeler farm on June 25, 1947, with Mrs. Montague and charged Mrs. Montague $35 per week for the remaining ten weeks of the season. Since June 25, 1947, the defendants have been engaged in active competition with the plaintiffs, furnishing all their guests rooms and meals at the Wheeler farm.

Up to July 4, 1947, Shannon's Lodge was filled only to about ⅓ of its capacity and Mr. Comstock became alarmed. He asked Mrs. Shannon what could be done. She replied that she was working on it and was sure that within a very short time she would be able to fill the remaining rooms in the Lodge. The plaintiffs received no help from her after July 1. She had the Wheeler farm booked full through the 1947 season but the plaintiffs did not know it. With the exception of Mrs. Montague, they first realized the defendants were taking paying guests on July 29, 1947, when the Shannons accepted a honeymoon couple at the Wheeler farm after the couple had made a reservation at "Shannon's Lodge". The plaintiffs paid an additional $6000 on the purchase price on August 15, 1947, and on August 25, 1947, accepted a deed of the premises and gave a mortgage to the defendants for the unpaid portion of the purchase price. They anticipated doing $7250 of business in 1947 but grossed only $2654 with a net income of $300. In the fall of 1947 they had to pay insurance premiums on the property.

The grounds of defendants' motion for a verdict were: 1. that the alleged representations were mere promises to do something in the future, 2. that the plaintiffs did not rely upon the alleged representations but knew at the time of the execution of the contract that, if made, they were not in fact true, 3. that the alleged representations were not made in regard to a material fact operating as an inducement to the contract, 4. that the allegations were not allegations of actionable fraud.

Our law is well settled that false representations or broken promises referring merely to the future do not afford the basis of actionable fraud. *Hunt* v. *Lewis,* 87 Vt 528, 530, 531, 90 A 578, Ann Cas 1916 C, 170; *Girard* v. *Jerry,* 95 Vt 129, 131, 113 A 533; *Woods* v. *Scott,* 107 Vt 249, 251, 178 A 886; *Tetreault* v. *Campbell,* 115 Vt 369, 378, 61 A2d 591; but it is apparent that the present case is not one where the action rests solely upon unfulfilled promises. Here it was alleged and the jury might reasonably have found that the defendants falsely represented that they wanted to retire from the inn keeping business, that they were retiring and that they were completely finished with that business. The jury might reasonably have found that these false representations were very material in inducing the plaintiffs to make the purchase. The jury could reasonably have found that the promises of the defendants that they would not compete but would help the plaintiffs in every way possible were steps in a scheme to defraud the plaintiffs and were a most apt and effectual means of accomplishing the fraud. So the jury might have been satisfied that the defendants made the sale to the plaintiffs by deceitful practices of which the promises were a part. Under such circumstances this court has held that the case comes within a well recognized exception to the rule regarding broken promises and that an action can be maintained. *Adams* v. *Soule,* 33 Vt 538, 544; *Wilbur* v. *Prior,* 67 Vt 508, 512, 32 A 474; *Harponola Co.* v. *Wilson,* 96 Vt 427, 435, 120 A 895. Therefore, it became a question for the jury to decide upon the evidence and the court below erred in ordering a verdict and in entering judgment on the verdict for the defendants.

The plaintiffs knew of the alleged fraud on August 25, 1947, when they accepted the deed and gave the mortgage but the jury could reasonably have found that the plaintiffs did not know of the alleged fraud but believed the false representations to be true and were relying on them when they signed the contracts and made part payment of the purchase price on June 2, 1947, and also on July 15, 1947. Upon discovering the alleged fraud the plaintiffs could have rescinded and demanded their money back. But they were not obliged to do so. Their evidence tended to show that circumstances forced them to take their rights under the contract and seek to recover damages for fraud which they had the right to do. *Mallory* v. *Leach,* 35 Vt 156, 168-172, 82 Am Dec 625; *McAllister* v. *Benjamin,* 96 Vt 475, 485, 121 A 263; *Land Finance*

*Corp.* v. *Sherwin Electric Co.,* 102 Vt 73, 81, 82, 146 A 72, 75 ALR 1025.

That the alleged representations were of material facts and were allegations of actionable fraud appears from what we have already said. So *the judgment is reversed and the cause remanded.*